UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| FIRST TECHNOLOGY CAPITAL, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 5:16-CV-138-REW |
| v. | ) ) | OPINION AND ORDER |
| BANCTEC, INC., | ) ) | |
| Defendant. | ) ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

As in many enduring business relationships that culminate in contentious litigation, First Technology Capital, Inc. (FTC), and BancTec, Inc. (BancTec), enjoyed a fruitful partnership for many years—one built on "good faith negotiations and gentlemen agreements"—but one that ultimately ended, mired in "controvers[y]" and "head-butting." DE #72-13 (Bridges Depo.), at 43 (Depo. p. 168). The parties had long enjoyed a series of positive sale / leaseback encounters, all under a broad 2006 master lease, with each deal per a sub-schedule. Things soured in 2015. In March 2016, FTC sued BancTec, asserting the following general claims:

1.   Breach of contract under Schedule 7 (which contains claims for rent due from 11/1/13 to 12/9/13, plus interest and "all costs and expenses," including reasonable attorney fees);

2.   Breach of contract under Schedule 8 (which contains claims for numerous rental payments, destruction of certain equipment, plus interest and "all costs and expenses," including reasonable attorney fees);

3.      Specific enforcement as to the Schedule 8 equipment;

4.      Conversion of the Schedule 8 equipment (including a claim for punitive damages); and

5.      Unjust enrichment regarding the Schedule 8 equipment.

DE #26 (Amended Complaint); *see also* DE #29 (Answer).

Following a heavily contested period of discovery and resolution of numerous intervening motions, the parties filed dueling motions for summary judgment, each of which is fully briefed and ripe for consideration. *See* DE ##42, 72, 74, 80, 83, 90, 91, 98, 102, 103, and 107. The Court has laboriously reviewed every page submitted—indeed, the entire docket—and carefully wrestled with the issues raised.

For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** each motion (DE ##42, 72, and 74). There is no genuine dispute of material fact regarding Schedule 7; the Court quickly dispatches that suite of claims, largely in BancTec's favor. Genuine disputes of material fact do, though, pervade the Schedule 8 record—and the Court *does* consider all relevant documents—surrounding the parties' intentions, and thus agreement, concerning Schedule 8. Due to related claims' interdependency on this foundational issue, the Court (with but a few exceptions detailed below) denies both sides summary judgment on the Schedule 8-related topics. A jury must decide the bulk of the Schedule 8 disputes.

## I.      RELEVANT BACKGROUND

In 2006, FTC and BancTec entered a Master Lease Agreement (MLA) in which, generally speaking, FTC agreed to lease BancTec certain items of equipment "listed on Schedule 'A' and any supplemental or additional schedule 'A' attached to and made a

part of" the MLA. *See* DE #26-1 (MLA). Each Schedule A "constitute[d] a single lease" under the MLA. *Id.*; *see also* DE #42-4, at 4. The arrangement was a sale / leaseback, where BancTec sold assets it already owned to FTC, and FTC leased the equipment, already in place, back to BancTec. The arrangement assisted BancTec's cash-flow and EBITDA, and FTC made money on an initial fee and the interest-rate spread. *See* DE ##74-2 (Cushman Depo.), at 8 (Depo. p. 23); 72-13 (Bridges Depo.), at 25 (Depo. p. 94); *id.* at 70 (Depo. p. 274). Paragraph 2 defined the commencement rent mechanics and the date of each lease "for the purpose of determining when the monthly rental charges begin[.]" DE #26-1, at ¶ 2. Over the years, the parties entered into many such Schedules. The present case concerns Sub-Schedule No. 7 (Schedule 7) and Sub-Schedule No. 8 (Schedule 8) to the MLA. *See* DE ##26-3, 26-10.

In Schedule 7, BancTec agreed to make 60 rental payments of $76,765.00 per month to FTC. DE #26-3, at 2. The parties also "incorporated" all "terms and conditions of the" MLA into Schedule 7. *Id.* BancTec accepted (on paper) the Schedule 7 equipment on October 21, 2008. *Id.* at 4; DE #29, at ¶ 21. In Schedule 8, BancTec agreed to make 60 rental payments of $58,027.00 per month to FTC. DE #26-10, at 2. The parties likewise "incorporated" all "terms and conditions of the" MLA into Schedule 8. *Id.* BancTec "accepted" the Schedule 8 equipment on December 1, 2009. *Id.* at 3; DE #29, at ¶ 54.[1] Further, the MLA provides that "each Lease"—*i.e.*, each Schedule—is "subject to the

---

[1] The parties spend many pages in the briefing sniping back and forth about various "facts" and the summary judgment standard's application thereto. As a general matter, given the Court's treatment of the issues in this Opinion, and except to the extent specifically addressed herein, the Court declines to specifically assess each and every cursory request, from each party, made in the midst of extensive briefing, to strike or disregard tendered proof. The Court has considered the proof that is competent under the Rule 56 rubric. In truth, there is very little actual dispute about the evidentiary field, but the parties certainly differ sharply on the legal effect or consequences of the proof.

terms and conditions of this Agreement until its expiration or termination." DE #26-1, at ¶ 1. As discussed, following many years of a workable business relationship, disputes arose, and the parties turned to state and federal court to hash out their plenteous disagreements. The merits of the claims are now fully before the Court for summary judgment consideration.

The parties take interesting tacks in approaching the record. FTC tries to lash BancTec to the fine and specific verbiage of the MLA, essentially ignoring deal-related and contemporaneous documentation and the parties' course of performance over the life of the MLA. BancTec tries to ignore MLA mechanics and draw the Court into a holistic assessment sensitive to the economic realities and equities of the relationship. Each side is right, and each side is wrong. On Schedule 7, the Court agrees that BancTec properly completed the purchase and owes, at most, interest on the slight delay in purchase payment. On Schedule 8, the Court perceives reasonable and legitimate questions about the parties' agreement and intent, as to the situation and claims involved. A jury will sort through most of the Schedule 8 claims, and will have to settle lease term (the 61st month issue), issues of default, and post-lease obligations, including the status of and remedies related to the Schedule 8 equipment.

## II.    STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986);

*Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552.

If the movant bears the burden of persuasion at trial, "that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Id.* at 2557 (Brennan, J., dissenting) (citation omitted); *see also Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (noting that, when the movant also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is "higher in that it must show that the record

contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it" (citation and internal quotation marks omitted)); *see also Celotex Corp.*, 106 S. Ct. at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).[2]

---

[2] The Court applies the same standard of review to cross-motions for summary judgment as when only one party files. *McKim v. New Market Techs., Inc.*, 370 F. App'x 600, 603 (6th Cir. 2010). The Court evaluates each motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration. *Beal ex rel. Putnam v. Walgreen Co.*, 408 F. App'x 898, 902 (6th Cir. 2010). Summary judgment for one side is not necessarily appropriate simply because the parties file cross-motions for summary judgment. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir.

## III.    ANALYSIS

The Court confronts the following motions:

1.    DE #42: FTC seeks judgment on (1) a claim to Schedule 7-based rent from 11/1/13 to 12/9/13 and accompanying delay charges; (2) a claim to Schedule 8-based rent from 12/1/14 to 10/1/15 and accompanying charges; (3) the conversion claim; (4) the specific enforcement claim; and (5) BancTec's liability for FTC's reasonable attorney fees.

2.    DE #74: FTC seeks judgment on (1) a claim concerning unauthorized and unnoticed destruction of certain Schedule 8 equipment, and (2) BancTec's liability for FTC's reasonable attorney fees.

3.    DE #72: BancTec seeks entry of judgment in its favor on all claims.

As previously indicated, each motion is fully briefed and ripe for consideration. *See* DE ##80, 83, 90, 91, 98, 102, 103, and 107.

The parties principally dispute the meaning / interpretation of their agreement— including consideration of the MLA, Schedules 7 and 8, and the applicability and import of other related documents. Agreement interpretation / construction, where the contract is clear, is purely an issue of law. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (citing cases).[3] "To prove a breach of contract, [FTC] must

---

2001). Indeed, "the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* (quoting 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720 (3d ed. 1998)).

[3] Due to the parties' agreement on this topic, the Court applies substantive Kentucky law without engaging in a separate choice of law analysis. *See also Erie R.R. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938); *Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002); DE #26-1 (MLA), at ¶ 20(e).

establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009); *see also, e.g.*, *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 813, 840 (S.D. Tex. 2013) (applying traditional contract breach elements to a UCC case).[4]

*First*—Schedule 7.

The key as to Schedule 7, to the Court, is that the MLA lease term had expired with no effective BancTec purchase election. *See* DE ##42-1, at 25 (FTC so admitting); 26, at ¶ 28 (noting expiration "on October 31, 2013"). In the Court's assessment, this unequivocally pushes the scenario into MLA ¶ 5(B) territory, which provides that the lease continues on a month-to-month basis until, as relevant here, BancTec's "total month-to-month rent payments equal" fair market value. Thus, at the point of expiration, BancTec had floated a document exploring purchase, the July 2013 letter (DE #26-6, at 3), but had not formally elected purchase. To quote FTC's own unambiguous view of the status:

> The July 11, 2013 Letter was not an "unqualified, absolute, unconditional unequivocal, unambiguous (*Civic Plaza*, 401 F.2d at 197) election by BancTec to exercise the "Fair Market Value" purchase option contained in ¶ 4(A). . . . Ultimately, the FTC and BancTec found common ground at $58,002.35 after the term of the lease of the Schedule 7 Equipment expired on October 31, 2013.

DE #42-1, at 25 (citing DE #42-2 (Carpenter Aff.), at ¶¶ 28, 50-52). Per ¶ 5(B), at lease expiration, BancTec had "not elected to renew the Lease [or], purchase or return the

---

[4] And the Kentucky UCC *does* govern this case. *See also* DE #26-1 (MLA), at ¶ 20(e). FTC never disputes this, although it does spend many pages separately undertaking Kentucky common law analysis.

Equipment." MLA ¶ 5; *see also* DE #42-2, at ¶ 103. FTC does not contend default existed, as to Schedule A, at that point. With no default,

> the Lease will be extended for each subject item of Equipment on a month-to-month basis until either [termination by Lessee] or: a) Lessee's total month-to-month rent payments equal the greater of the fair market value or Stipulated purchase Value of the Equipment, at which time Lessor shall transfer title to Lessee[.]

MLA ¶ 5(B). BancTec and FTC actively negotiated the purchase post-expiration, *see* DE 42-9 through 42-12 (negotiating emails), ultimately reaching agreement in the latter part of November. Tellingly, in none of the offers does FTC suggest it is seeking a buy-out *plus* additional rent. Indeed, the parties simply negotiated out the value, agreed on a price, and FTC invoiced BancTec. The obvious arms' length negotiations produced eventual agreement, the essence of fair market value. MLA ¶ 4(A); *see also* DE ##42-19, at 2-22; 42-20; 42-21; 42-22 (Schedule 8 post-expiration negotiations directly referencing FMV, by both parties, at multiple points).

The long and short is that BancTec did owe a continuing rental obligation, but it owed that obligation, per ¶ 5(B), only until the payments reached the greater of fair market or stipulated purchase value. Fair market value—the parties' negotiated price— caps the obligation once reached via rent payments. Here, the parties agreed to that number, and BancTec paid it by December 9, 2013. The Court finds that the MLA clearly forecloses FTC's post-expiration rent claim, which BancTec already has paid in full. There are no triable issues, and the agreement analysis compels this result under the plain language and clear operation of the MLA as to this context. Quite simply, that concludes the claim as to FTC's holdover rent argument for the period between 11/1/13 and 12/9/13.

MLA ¶¶ 4(E) and 20(g) do not compel a contrary result. Those provisions are simply not applicable to this post-expiration agreed purchase scenario, and, if indeed they controlled, ¶ 5(B) could *never* operate. Paragraph 5(B) is the MLA's automatic post-expiration purchase mechanism; 20(g) and 4(E) obviously apply only to a mid-lease purchase. Courts construe contracts "as a whole, giving effect to all parts and every word in it if possible." *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986). Here, per the Court's assessment, ¶¶ 4(E) and 20(g) cannot sensibly apply to a post-expiration purchase without rendering ¶ 5(B) a complete nullity. The Court declines to enforce that interpretation and instead concludes that ¶ 5(B) governs as to Schedule 7.

The Court does, however, hold that BancTec owes the applicable interest from 11/16/13 to 12/9/13, per MLA ¶ 3 (which kicks in at a 15+ day arrearage). The attorney fee claim, as to Schedule 7, is not one the Court can resolve on this record. This decision limits BancTec's obligation to a small amount of interest on the delayed post-expiration payment. It is not clear that FTC gave BancTec notice of this discrete element, under ¶ 17. If so, it also is not clear that the slight delay qualifies as a default, and even less clear that the non-payment of interest, if a default, itself resulted in "costs and expenses incurred by Lessor on account of such default." MLA ¶ 17. The Court will reserve any adjudication on an attorney fee claim until seeing the full resolution of all claims. To summarize, as to Schedule 7, the Court grants summary judgment to BancTec on all issues except the described interest claim, on which the Court grants summary judgment to FTC. The Court denies without prejudice the attorney fee claim at this time and will address the matter on full briefing when the other liability issues conclude. There is no jury issue regarding Schedule 7.

*Second*—Schedule 8.

Schedule 8 presents different, and more complicated, questions. FTC "requests that the Court enter a summary judgment for FTC and against BancTec . . . on FTC's Schedule 8 rent claim . . . together with a per diem late charge . . . until paid in full." DE #42-1, at 31. BancTec treated the brief as fairly encompassing a claim for "[S]chedule 8 rent for the period between December 1, 2015 [sic] and October 1, 2015," *see* DE #83, at 1, so the Court considers this claim.[5]

The Court begins with the foundational issue of defining the documents that make up the parties' Schedule 8 agreement. The Court concludes that the entire suite of documents associated with the December 1, 2009, signing come into play here. *See, e.g.*, *A & A Mech., Inc. v. Thermal Equipment Sales, Inc.*, 998 S.W.2d 505, 510 (Ky. Ct. App. 1999) ("[A] trial court may consider evidence of circumstances surrounding the agreement—particularly with respect to related writings, course of dealing, course of performance, and usage of trade—to explain and supplement, but not to contradict, the agreement's written terms.") (affirming consideration of an extrinsic bid sheet in agreement construction); *Hercules Machinery Corp. v. McElwee Bros., Inc.*, No. Civ. A. 01-3651, 2002 WL 31015598, at *4 (E.D. La. Sept. 9, 2002) (construing two faxes "executed at around the same time of the contract and [that] pertained to the same subject matter . . . together with the contract as a whole");[6] *Noble Roman's Inc. v. Pizza Boxes,*

---

[5] BancTec asserts that "FTC did not plead that it was entitled to [S]chedule 8 rent for December 2014," DE #83, at 18 n.2, but the record clearly belies that statement. *See* DE #26, at ¶¶ 71, 91, 92, 101, 102, 111, and 117.

[6] "Foreign authority [is] non-binding," of course, "but the [UCC]'s goal of consistency enhances that authority's persuasiveness." *A & A Mech.*, 998 S.W.2d at 511 n.4. Kentucky's courts have suggested, for purposes of analysis, "becom[ing] acquainted with business practices and Code interpretations in jurisdictions other than our own." *Id.*

*Inc.*, 835 N.E.2d 1094, 1100 (Ind. Ct. App. 2005) (divining parties' intent via a "November letter and the parties' course of performance"); KRS 355.2A-202.[7]

The documents—including the signed quote, the signed assignment papers, and the attachments—were all part of the contemporaneous Schedule 8 transaction. *See, e.g.*, *Dimension Serv. Corp. v. Don Jacobs Imports, Inc.*, No. 2012-CA-1874-MR, 2014 WL 97465, at *8 (Ky. Ct. App. Jan. 10, 2014) (Under Kentucky law, "writings executed as part of the same transaction should be read together as a whole." (emphasis removed)). Nothing forecloses (and in fact the UCC directs) consideration of them as part of and as evidence of the parties' agreement. Indeed, MLA ¶ 21 itself contemplates future Scheduling documents—as well as the formational documents leading up to a Schedule. FTC's counter-arguments on this point fundamentally beg the question of what body of documents constitutes the parties' agreement. Thus, under "the parol evidence rule set forth in KRS 355.2-202, terms included in a writing intended by the parties to be a complete and exclusive statement of the terms of the contract may not be contradicted by any prior oral or written agreement or by any oral agreement entered into contemporaneously with the written agreement intended to be the final expression of those terms. **But two written documents executed contemporaneously may be**

---

[7] The Kentucky UCC defines "course of performance" at KRS 355.1-303(1). Such a course of performance "is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." KRS 355.1-303(4). The UCC, in general terms, is designed to better reflect commercial reality—"to simplify, clarify and modernize the law governing commercial transactions [and] to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 506 (5th Cir. 2014); *see also Nat'l Cash Register Co. v. K.W.C., Inc.*, 432 F. Supp. 82, 86 (E.D. Ky. 1977) (same); KRS 355.1-303(1). "To th[ose] end[s], the UCC has to be liberally construed and applied." *Coastal Agric.*, 759 F.3d at 506.

**considered together as evidence of the parties' agreement**." *In re Calumet Farm, Inc.*, 150 B.R. 403, 409 (Bankr. E.D. Ky. 1992) (emphasis added).[8]

MLA ¶ 21 in no way precludes viewing the full suite of December 1 paper as defining the deal. That paragraph blesses inclusion of "other documents described or contemplated" and does not exclude consideration of contemporaneous *written* agreements. The MLA anticipates lease assignment, ¶ 19, and assignment notice, *id.*, and those documents bear the same date and were part of the same cluster of documents originating December 1. The notice defines the word "Lease" as including Schedule 8 "together with all agreements, documents and writings executed in connection therewith." DE #80-6. The UCC defines the lease as the parties' bargain in fact, KRS 355.2A-103(k), the "bargain, with respect to the lease, of the lessor and the lessee in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance[.]" The constellation of writings from December 1 fall clearly within the factual bargain.[9] That bargain included the governing quote, sent by FTC (and signed by both sides) as the defining offer and acceptance, papered by the remainder of the simultaneously sent and executed sheaf of papers.

The Court thus concludes that the proper view of the agreement is broader than the strict MLA-Schedule bilateralism FTC urges. *See, e.g.*, 2 Anderson U.C.C. § 2-202:54 ("The fact that other writings are executed at the same time or as part of the same

---

[8] Article 2 authority "can be used to interpret UCC Article 2A[.]" *Fish v. Home Depot USA, Inc.*, 455 F. App'x 575, 583 n.3 (6th Cir. 2012) (citing James J. White & Robert S. Summers, Uniform Commercial Code § 14-4 (5th ed. 2011)).

[9] As Lisa Bridges put it, multiple times, BancTec considered the full packet of 12/1 documents as defining the agreement. *See* DE #72-13 (Bridges Depo.), at 39, 46, 60, 64 (Depo. pp. 151, 181, 236, 250). FTC authored and assembled the packet and sent it to BancTec. Both sides signed all documents under the operative and universal 12/1 date.

transaction as the writing in question is relevant to determining whether that writing is the exclusive statement of the parties' agreement. The other writings are properly admissible into evidence when it is found that the writing in question, together with the other writings contemporaneously executed, are part of one contract. Thus, the parol evidence rule does not bar proof of contemporaneous written agreements."); *A & A Mech.*, 998 S.W.2d at 510 (highlighting that a "principle purpose of the UCC" is to permit parties "to rely on certain objective standards of fair and reasonable dealing"); *id.* at 510-11 (rejecting reliance on a merger clause similar to the one in this case, as inconsistent with "the Code's policy of encouraging the enforcement of relatively informal agreements"); *Stern & Co. v. State Loan & Fin. Corp.*, 238 F. Supp. 901, 911-12 (D. Del. 1965); 4C Anderson U.C.C. § 2A-202:36; 2 Anderson U.C.C. §§ 2-202:4, 2-202:124, and 2-202:126; DE #80, at 27 (FTC conceding that "[c]onstruing written agreements in light of contemporaneous counterparts is the UCC default rule"); *id.* at 31 (FTC admitting that, "[a]t most, . . . the parties intended to agree to a remaining-lease-stream-payment purchase option for Schedule 7 and 8, as evidenced by the preliminary discussion of that term in the quotations," but arguing that legally they "failed to actually do so").

A case much more on point than any the parties identify is *Levien Leasing Co. v. Dickey Co.*, 380 N.W.2d 748 (Iowa Ct. App. 1985). There, on

> May 15, 1978, defendant Dickey leased a truck from plaintiff Levien Leasing for four years under a written agreement stating that it was the complete agreement of the parties. No option to purchase at the expiration of the lease term was provided in this standard motor vehicle lease.
>
> The original sales proposal which was subsequently sent to Dickey by Levien Leasing contained a typewritten provision towards the bottom of the page which stated:
>
> Lease price:

48 months at $915.55 per month

49th month purchase price at $100.00

*Id.* at 750. That factual circumstance, to the Court, is remarkably similar (though not, of course, identical) to the situation here. At the end of the lease term, Dickey wanted to exercise the purported purchase option (not contained in the main contract document—only in the extrinsic "sales proposal") and buy the truck. *Id.* Levien rejected such "a tender by Dickey," prompting the suit. *Id.* "Relying in part on parol evidence, the trial court" entered judgment for Dickey, "finding the evidence sufficient to establish the existence of a purchase option agreement separate from the lease agreement." *Id.* The Iowa Court of Appeals affirmed that decision and reasoning, holding there that "the parol evidence rule [did] not bar extrinsic evidence of a purchase option." *Id.* at 752.

Similarly, in *Posey v. Ford Motor Credit Co.*, 111 P.3d 477 (Idaho Ct. App. 2005), involving another truck lease, the court of appeals, applying the Idaho UCC, reversed the trial court, remanding to "go beyond the 'four corners' of the written agreement and consider not only the language of the agreement but all extrinsic evidence relevant to the parties' intent." *Id.* at 481. The appellate court thus found consideration of oral representations by dealer representatives, and a subsequent letter, relevant to the parties' intent regarding the lease duration and resulting purchase option. *See also, e.g.*, *Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 746 n.5 (5th Cir. 1981) ("affirm[ing] the holding that the parol evidence was admissible to prove the oral option agreement incident to the execution of the sale-leaseback documents and forming an integral part of the entire agreement between the parties"); *Seascape Dev., LLC v. Fairway Capital, LLC*, No. 10-301 JMS/RLP, 2011 WL 1134296,

at *10-12 (D. Haw. Mar. 23, 2011) (considering the extrinsic evidence of a "Sonny Ventures Letter Agreement" and discussing the UCC's more "liberal approach to extrinsic evidence"). The Court simply re-treads these cases'—and the UCC's—path in this dispute.

The UCC's parol evidence rule here permits consideration of the full December 1 paper. The Court finds that the group of documents together reflects the parties' written final expression of the agreement. Moreover, FTC, via Jim Bates, did not view the quote as contradictory to the MLA; he said so many times in deposition. *See* DE #72-20 (Bates Depo.), at 37, 44 (Depo. pp. 145, 170).

Applying this framework, did BancTec breach the Schedule 8 agreement? The Court concludes that contract ambiguity precludes it from granting summary judgment to either side on this question; a jury will have to resolve the issue. *See, e.g.*, *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 553, 556 (Ky. 2006) ("Certainly, if the writing is ambiguous, the factual question of what the parties intended is for the jury to decide."); *Clark v. Hectus & Strause PLLC*, 345 S.W.3d 857, 860 (Ky. Ct. App. 2011) ("In light of the ambiguous nature of the parties' fee agreement, their arguments clearly present genuine issues of material fact that cannot be properly resolved via summary judgment. . . . [T]he question will have to be resolved by a finder of fact."); *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 n.12 (Ky. 2003) ("[A]n ambiguous contract is one capable of more than one different, reasonable interpretation.").

FTC claims that strict operation of the definitional terms in MLA ¶¶ 2-3 shows BancTec to have underpaid by one month. One take on the record supports the view,

based on execution dates and rote application of the 2006 terms to the 2009 Schedule 8. A jury could conclude that the deal for a 60 month lease required a 61st month.

However, there is significant and reasonable evidence to the contrary. The quote was for a 60 month deal. DE #42-14, at 2. Indeed, that is what BancTec sought. *See, e.g.*, DE #72-17, at 1-2. FTC described the lease as for 60 months on multiple occasions including, critically, in all of the assignment paperwork. *See* DE ##26-5, at 3-4; 26-12; 72-15, at 15-16. This is strong proof, contemporaneous to and as part of the contract, that the full duration was 60 monthly payments, not 60 plus a month of interim rent.

The Court views the parties' course of performance as also supporting BancTec's view. FTC, which had invoiced for interim rent as a matter of course on prior schedules, never invoiced for interim rent on Schedule 8 or its immediate predecessor (and like deal) Schedule 7. Over the course of both transactions, FTC did not suggest that its imbedded one month of interim rent existed as a claim. When BancTec repurchased the Schedule 7 assets, FTC did not claim interim rent. At no point through the years did FTC articulate the claim.

In September 2014, as Schedule 8 approached expiration, BancTec initiated discussion of repurchase. In that letter, BancTec stated that it would make "the final lease payment for Schedule #8 . . . in November 2014." DE 72-24. That would mark the 60th of 60 payments, prompting the proposal. FTC did not, during those negotiations, suggest that BancTec owed a 61st month as part of the lease's initial term. This is corroborative of the term as defined in the Schedule 8 quote and the bilateral characterizations in the assignment documents.

In the Court's view, the definitional terms (and use of the templates) created some ostensible disharmony within the deal, as to the 60 or 61 month duration. BancTec claims to have intended "60 months, period." DE #72-19 (Cushman Depo.), at 8 (Depo. p. 26). The assignment documents—using the verbiage endorsed by both sides—state: "The Term of the Lease is 60 months commencing December 1, 2009." DE ##80-6; 26-12 (assignment "Term of Lease: 60 months"). Still, the mechanics of the MLA, under the labeled, defined terms, could support the Commencement Date, Initial Term, and rent payment obligations FTC proffers. A jury will decide which side captures the parties' intent on the durational question.

Here, the agreement—to include all relevant evidence—is ambiguous on the intended lease term. A jury could find that the parties agreed to (essentially) a 61-month deal, based on the strict MLA / Schedule interpretation for which FTC advocates. On the other hand, a jury could find, considering the quote, *see* DE #72-7, at 20-21, the assignment documents, *see, e.g.*, DE #80-6, at 1-2, the lack of interim rent invoicing, the lack of such invoicing on Schedule 7, the fact that FTC stayed silent on the matter for over 5 years, and the fact that FTC did not object when BancTec said in the purchase letter offer that November 2014 was the last payment, *see* DE #72-24, at 1, that the parties agreed to a 60-month total deal, inclusive of December 2009. Also contributing to the latter view is the overall execution milieu; remember that negotiations and the closing sandwiched Thanksgiving 2009. The talks themselves were before the holiday, and the quote was dated both 11/25/09 and 11/30/09. *Compare* DE #72-7, at 20 (11/25)*, with id.* at 21 (11/30). BancTec indeed physically signed the papers on 12/1, *see id.*, but the equipment was all in place—the signing was simply a paper event. Had BancTec signed

on 11/30, there would be no issue on the 60-month argument. Thus, the papers read like there was an installation date, but these were abstract deals in which no asset actually moved. BancTec owned the equipment, sold it in place to FTC, and FTC leased it back, in place, to BancTec. The reality of the transaction is something the jury must assess in deciding whether the parties intended the decision by BancTec to sign everything on 12/1 instead of 11/30 created a 61st month of rent obligation.

A jury will have to decide what the parties agreed to here. It may find a lease paid in full; it may find that BancTec owes one more month. The Court finds there to be a palpable jury question on the parties' intent under the various and conflicting documents surrounding Schedule 8. *See generally, e.g.*, *BVS, Inc. v. CDW Direct, LLC*, 759 F.3d 869, 873 (8th Cir. 2014); *Hatley v. Stafford*, 588 P.2d 603, 610 (Or. 1978).

### Schedule 8 Equipment Status

The equipment has been in limbo, and the jury will sort out its final status. However, the questions for the jury are narrow and center on valuation.

First, the Court determines that the fair market value of the equipment, as of lease expiration, is a material fact in dispute. The Court finds, as a matter of law, that the parties did agree that BancTec's purchase option throughout the MLA / Schedule 8 operation would be **the greater of** fair market value or a stipulated purchase price. The MLA expressly states that understanding in ¶ 4(A). The quotes (for Schedule 7 and Schedule 8) do provide an agreed route for BancTec's purchase option, but, in the Court's view, that clearly only populates the stipulated purchase value option—remaining lease payments. *See* DE #72-20 (Bates Depo.), at 35 (Depo. p. 135). The quotes did not

eliminate the comparative fair market value option and did not do away with the "greater of" rule in ¶ 4(A).[10]

Again, the Court views the quotes as part of the deal but also as (here) not in conflict with the MLA. Two vital evidence pieces prevent a fact question on the "greater of" rule. First, Lisa Bridges (thus BancTec) knew at the precise time of the 12/1 deal, that the greater of rule was part of the MLA. The day prior to the 12/1 signings, she emailed FTC to flag that status and seek a change. DE #72-28 (Bridges requesting "an amendment to the master which changes the above 'greater' to be 'lesser'"). She declared that BancTec "took a glance at the master agreement again with regard to the Purchase of Equipment." *Id.* The requested change did not happen. Indeed, in a 12/9 email, Bates confirmed he had refused any change. DE #72-32 ("I refused . . . The lease remains a FMV at end of lease term."). BancTec forged ahead on 12/1 with full knowledge of the applicable MLA rule.

Further, BancTec acted in accordance with the "greater of" rule under both Schedule 7 and Schedule 8. At the end of Schedule 7, and despite what BancTec may now contend about the quote effects, BancTec initiated negotiation for and bought out the Schedule 7 equipment. It did not claim that full lease payment yielded a zero or nominal buy out right. *See* DE #26-6, at 3; 26-7; 26-8. Then, as Schedule 8 drew to a close, BancTec again kicked off negotiations, expressly metering the potential purchase to an

---

[10] This makes much sense in light of the actual deals. Imagine in month two, if BancTec had tried to buy out by paying only FMV. The actual equipment was only a part of the total money; half of the funds were really a loan to BancTec without associated collateral. *See* DE #72-13 (Bridges Depo.), at 68 (Depo. p. 268). The "remaining lease stream payments" would protect FTC in that context, as the "greater" option. As the lease elapsed, the numbers would have crossed paths, with FMV at some point equaling or surpassing the lease stream.

agreed FMV. *See* DE ##42-19 & 42-20 (both sides referencing FMV). The Court will not allow BancTec to know about and operate under the "greater of" rule and then contend the rule does not exist. While the course of performance will be important evidence (for both sides) at trial, the agreement, quotes included, unambiguously includes the "greater of" toggle, and the Court will hold BancTec to that.

If the jury finds that BancTec paid the lease in full (rejecting the 61 month lease claim and thus rejecting default), then the Court concludes that ¶ 5(B) again would apply.[11] In that situation, the lease would have expired with no renewal or purchase, triggering the month-to-month automatic purchase option. FMV would define and cap the liability of BancTec, and the jury would find that amount as of the lease expiration date. If the jury finds BancTec in default, relative to the rental due, the result is unclear under the MLA. The default would block ¶ 5(B), which is the month-to-month option. Although FTC claims continuing monthly rental under the MLA, the Court sees no contractual basis for a month-to-month rental when the lease expires and the lessee has defaulted. FTC cites nothing beyond the MLA on that issue, and the MLA pegs month-to-month renewal as **dependent on the absence of default**. The briefing does not offer a convincing theory on this for either side. Certainly, BancTec did not and does not have the right to simply keep the equipment without having effectuated a proper buyout. Thus, the limbo.

---

[11] FTC has not contended that any other default, except non-payment of rent (DE #91, at 10), would block this application of ¶ 5(B). It resists ¶ 5(B) premised on nonpayment of the 61st month, and dependent ensuing months.

*Conversion*

The best framework the Court can formulate to this thorny problem is to treat the scenario as transforming into one the tort of conversion targets. On that front, FTC, too, seeks judgment as to "BancTec's liability for converting the Schedule 8 Equipment[.]" DE #42-1, at 32. BancTec offers a one-paragraph response. DE #83, at 18.

"Conversion is an intentional tort that involves the wrongful exercise of dominion and control over the property of another." *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853 (Ky. Ct. App. 2014). In Kentucky, the elements of conversion are:

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005).

The parties' briefing focuses particularly on the co-existence of a conversion claim with the breach of contract claims, perhaps reflecting an issue of tangential Court interest earlier in the case. As FTC recognizes, the Court indeed previously noted "some questions about the intersection of a contract-based case and this [tort] theory." DE #41, at 1. The Court particularly cited *Jones*, 454 S.W.3d at 853-54, as the basis for the mid-discovery expression of doubt. BancTec's entire response regarding the conversion claim is to simply parrot the prior footnoted citation to *Jones*. DE #83, at 18.

*Jones* addressed a situation in which Marquis Terminal, Inc., rented three belt conveyors from Mr. Jones "to unload coke from river barges for screening and transport by rail." *Id.* at 850-51. At a bench trial, "the trial court found that Marquis agreed to rent the equipment and knew that it was obligated to pay Jones's invoices." *Id.* at 851. The Court of Appeals summarized: "The court found that while the equipment was still in Marquis's possession at the time of trial, Jones was not entitled to recover rent after he should have taken steps to mitigate his damages and recover his equipment." *Id.* (internal quotation marks removed).

In addition to a breach of contract claim, Jones also "alleged that Marquis wrongfully converted the equipment in reckless disregard of his rights." *Id.* at 853. The trial court, though, declined to award conversion-based tort damages. *Id.* The Court of Appeals affirmed that decision, on the facts of the case, reasoning, in full:

> Although a breach of contract action and a claim for conversion are not necessarily incompatible, they do not coincide under the circumstances presented in the case before us. While Jones's complaint did not state with particularity the basis of his tort claim, it does not appear that the rented equipment was physically damaged in any material way. Furthermore, the court finally ordered the return of Jones's equipment, and the economic losses arising from the breach of contract were fully recoverable upon its return. Jones did not show that he sustained tort damages or a loss independent of the contract damages. Thus, the trial court did not err by failing to award Jones either the value of the equipment or punitive damages for its conversion.

*Jones*, 454 S.W.3d at 853-54.

This analysis reflects several important considerations. Most obviously, the Kentucky Court of Appeals prefaced its discussion of the intersection of contract- and tort-based claims by explicitly acknowledging that such claims "are not necessarily incompatible." Rather, the court held, they merely did "not coincide under the

circumstances presented in the case." The court countenanced consideration of "physical[] damage[]" to the subject property or any "damages" or "loss independent of the contract damages" as possible dividing lines between the contract and tort claims.

Federal courts in Kentucky have recognized similar limitations on a plaintiff's ability to recover on both breach of contract and conversion theories:

> Importantly, even if a plaintiff can satisfy all seven of the aforementioned elements [of conversion], 'a plaintiff cannot maintain a conversion claim in addition to a breach of contract claim unless [it] can establish the existence of an independent legal duty separate and apart from the contractual obligation.' *Beacon Enter. Solutions Grp., Inc. v. MDT Labor, LLC*, No. 3:12-CV-00759-H, 2013 WL 253134, at *4 (W.D. Ky. Jan. 23, 2013) (alteration in original) (quoting *First Constr., LLC v. Gravelroad Entm't, LLC*, No. 6:07-155-DCR, 2008 WL 2038878, at *5 (E.D. Ky. May 12, 2008)). In other words, 'a conversion claim cannot be brought where the property right alleged to have been converted arises entirely from the contractual rights.' *Id.* (quoting *Davis*, 399 F. Supp. 2d at 801 (internal quotation marks omitted)). While '[a] conversion claim and contract claims are not always incompatible,' this rule does act as an impediment to conversion claims. *See Davis*, 399 F. Supp. 2d at 801.

*Duracore Pty Ltd. v. Applied Concrete Tech., Inc.*, No. 5:13-CV-184-TBR, 2016 WL 3620793, at *5-*6 (W.D. Ky. June 28, 2016) (citations altered). At bottom, *Duracore*, consistent with the myriad other district court opinions on the topic (a string cite of which the Court omits for brevity), held that the plaintiff "simply cannot bring a claim for conversion as a matter of law because the sole property right alleged to have been converted arises entirely from rights created by the contract at issue." *Id.* at *6. As *Davis* further explained:

> A conversion claim and contract claims are not always incompatible. Here, however, the conversion claim does not lie because the property right alleged to have been converted arises entirely from the contractual rights to compensation. In reality, Davis seeks payment of a disputed debt, not payment for the conversion of a specific asset or a specific property right.

399 F. Supp. 2d at 801. In light of all the above case law, FTC does not convince the Court that, as a categorical matter, the Kentucky Supreme Court would reject the line *Jones* recognizes. The cases from Kentucky federal district courts enforcing the *Jones* distinction are legend, and the Kentucky Court of Appeals has, for over a decade, and with no correction from the State Supreme Court, recognized the general line between contract and tort claims that *Jones* again affirmed. *See Mims v. Western-Southern Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. Ct. App. 2007) (explaining, as a general matter, that while a "failure to perform a contractual obligation typically does not give rise to a cause of action in tort," "if a plaintiff can establish the existence of an independent legal duty, he may maintain an action in tort even though the acts complained of also constitute a breach of contract").

The Court denies summary judgment on conversion. If BancTec did not default on rental payments, the jury will meter purchase liability under ¶ 5(B) at FMV, and BancTec will owe that amount, yielding title to it and negating conversion. If BancTec did default, then the Court anticipates the jury evaluating FMV as a conversion remedy, given that BancTec would have neither renewed the lease, purchased the equipment, nor returned it to FTC. The nominal buy-out talk, course of performance under the MLA (including prior purchases and the Schedule 7 conduct), the purchase offers ($25,000 with a later counter of $100,000 plus rent) and Bates's stated view of the equipment as "scrap" will impact the valuation, to be sure, but, if BancTec did breach, it had no right to simply hold the equipment without compensation to FTC.

The Court reiterates that the MLA and the parties simply do not address the purchase mechanics with a lessee in default at the expiration of the lease. If the

agreement concludes the matter, the conversion claim is inapplicable. If the agreement's silence on a post-expiration lessee in default signals absence of a contractual remedy, then conversion may well be the stop-gap claim. For either scenario, though, the jury must confront and resolve the Schedule 8 issues, including equipment value as of lease expiration in November-December 2014.[12]

*Equipment Destruction Claim*

Next, in FTC's second summary judgment motion, DE #74, FTC seeks entry of "a partial summary judgment for FTC and against BancTec on Count I [sic] of the Complaint in the amount of $357,955" due to the alleged destruction of "the hard drives from approximately 200 of the 216 pieces of IT-related equipment set forth on the list of equipment attached to Schedule B to Schedule 8." DE #74-1, at 10-11. BancTec opposes. DE #83, at 18-20.

As a starting point, the Court notes that this claim appears in Count II, not I, of the Complaint. *See* DE #26, at 21. In DE #83, BancTec does not factually dispute FTC's

---

[12] If BancTec must pay a conversion judgment, that would eliminate the ownership issue—*i.e.*, in this theory, once BancTec pays FMV, it owns the at-issue equipment, ending the specific performance and other rental claims. *See, e.g.*, *Lawyers' Mortg. Corp. of Boston v. Paramount Laundries*, 191 N.E. 398, 400 (Mass. 1934) ("Upon satisfaction of the damages, the title to the goods passes to the wrongdoer."); *Pierpoint v. Hoyt*, 182 N.E. 235, 236 (N.Y. 1932) (same proposition); *Third Nat'l Bank v. Rice*, 161 F. 822, 826 (8th Cir. 1908) (collecting cases for the proposition "that the title so acquired by the tort-feasor takes effect from the time of the conversion" and "conced[ing]" the "correctness" of the notion that once converters "satisfied the judgment against them for the tort they became substituted to the owner's right to the [converted property] from the date of the conversion"); *Lovejoy v. Murray*, 70 U.S. 1, 11-12 (1865) (same proposition); *cf. Urban v. Lansing's Adm'r*, 39 S.W.2d 219, 221 (Ky. 1931) ("Since no title can pass through a thief, a purchaser of stolen property acquires no rights as against the rightful owner and he will be compelled to give up the property *unless he has converted it*, in which event he will be held in trover for its value." (emphasis added)).

allegations in any way. Rather, BancTec merely raises arguments concerning a new defense centered on certain Payment Card Industry Data Security Standards (PCI-DSS).

The Court, primarily, declines to assess BancTec's tardily-asserted "defense" to this claim concerning the PCI-DSS. *See* DE #83, at 18-20. "Failure to plead an affirmative defense in the first responsive pleading to a complaint generally results in a waiver of that defense." *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004). However, a "defendant does not waive an affirmative defense if the defense is raised at a time when plaintiff's ability to respond is not prejudiced." *R.H. Cochran & Assocs., Inc. v. Sheet Metal Workers Int'l Ass'n Local Union No. 33*, 335 F. App'x 516, 519 (6th Cir. 2009). Such prejudice occurs when, for instance, "the opposing party had no notice that the defendant was going to raise that defense at trial, and therefore could not conduct any discovery or trial preparation on that issue." *Swart v. Pitcher*, 9 F.3d 109, No. 92-2401, 1993 WL 406802, at *3 (6th Cir. Oct. 8, 1993) (table) (citing cases). That is just the situation here—by all appearances, FTC "had no notice that" BancTec "was going to raise that defense" and "therefore could not conduct any discovery" on it. BancTec has thus waived the defense.

Even evaluating the defense on the merits, BancTec makes no claim that the PCI-DSS carry the force of law or trump BancTec's contractual obligations. The Court perceives that they do not. *See, e.g.*, *Willingham v. Global Payments, Inc.*, No. 1:12-CV-1157-RWS, 2013 WL 440702, at *19 (N.D. Ga. Feb. 5, 2013) (finding "no case law that would support a finding that commercial standards or general industry standards such as PCI-DSS would create a legal duty"). The Court does not perceive that such amorphous ("*risk* being audited and fined") industry standards, most cursorily inserted in the case,

could define BancTec's proper course of conduct, contra an unambiguous contractual agreement to the opposite. Further, as FTC quite rightly points out, PCI-DSS § 9.8 only requires destruction "when it is no longer needed for business or legal reasons"—a contract requiring BancTec to keep the equipment in good condition and working order being a prime example of such a reason excepting the equipment from potential destruction. *See* DE #91-4, at 2. Additionally, physical destruction is but one option; PCI-DSS § 9.8 also permits utilizing "a secure wipe program . . . for secure deletion," which BancTec does not address. *Id.* There is no merit to BancTec's attempted PCI-DSS defense.

As FTC argues, the MLA—the parties' agreement—required BancTec to keep the leased equipment "in good condition and working order, normal wear and tear excepted." DE #26-1, at ¶ 6. Separately, BancTec agreed (and the MLA required it) to keep the equipment "in good working order." *Id.* at ¶ 10. BancTec's speaker on this topic—Terry Holash[13]—admitted in his deposition the 2011-14 destruction as alleged by FTC. DE #74-9, at 12-16. Destroying equipment is not keeping it "in good condition and working order" or "in good working order." Accordingly, BancTec breached in this regard; there is no jury issue on this undisputed topic.

On damages, FTC claims a right to $357,955.00. DE #74-1, at 10-11; *see also* DE ##74-6 (Carpenter Declaration);[14] 74-11 (Damage Calculation); 89-2 (Supplement to

---

[13] There is some uncertainty in the record concerning the spelling of Mr. Holash's surname. *Compare* DE #74-9, at 2 (Title page using "Holash")*, with id.* at 5 (deponent stating his own name as "Terry Holsh"). "Holash" appears to be the correct spelling, *see* DE #83-19 (Declaration using "Holash"), which is the one the Court adopts.

[14] BancTec cursorily, with no support, asks the Court to strike DE #74-6. The basis, as best the Court can tell, appears to be that BancTec purports to disagree with the

Initial Disclosures). BancTec opposed that calculation. *See* DE #83, at 11, 18-20. The Court reserves the issue of damages pending trial, given the need to resolve the purchase status. Thus, if the jury determines that the agreement obligated BancTec to purchase for fair market value, then FTC would not get an additional remedy for the alterations. Further, any conversion recovery likely also would impact this count, although the Court would treat FMV as defined to fairly reflect value if BancTec had fulfilled its duty to preserve the equipment.[15]

To summarize, as to Schedule 8, the Court denies both sides summary judgment on all breach / rent / valuation claims, and on conversion. The "greater of" mechanism continues to apply, and the quotes (and buy-out alternative) are part of the agreement. The Courts grants FTC summary judgment on the property alteration default, but denies summary judgment on connected damages. The Court will set the matter for a prompt trial to resolve all remaining issues.

## IV.    CONCLUSION

For the reasons, to the extent, and on the terms stated, the Court **GRANTS IN PART** and **DENIES IN PART** DE ##42, 72, and 74.

This the 26th day of September, 2017.

---

[15] information in the declaration, which is no basis to strike. *See, e.g.*, *Cottenham v. Saginaw Cnty.*, No. 00-73817, 2001 WL 558235, at *3 (E.D. Mich. Mar. 9, 2001).
[15] The Court has significant questions about the damage figures given that Holash's estimate of machines affected was "very much a guess," DE #74-9 (Holash Depo.), at 14-15 (Depo pp. 13-14), and he did not "have anything to base [it] on." *Id.* at 16 (Depo. p. 15). The Court's review indicates factual questions about the number and particulars of machines at issue. Carpenter, it seems, took the 2009 book value (and assumed drive removal reduced value to zero) as the loss total for machines altered through the years. It is not clear to the Court that this is an accurate measure of loss. Like other issues, the trial will need to iron out damages via competent evidence.



**Signed By:**

*Robert E. Wier*

**United States Magistrate Judge**