UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| FIRST TECHNOLOGY CAPITAL, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 5:16-CV-138-REW |
| v. | ) ) | OPINION AND ORDER |
| BANCTEC, INC., | ) ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The summary judgment bell has rung, and this case moves to the next round, requiring the Court to evaluate the admissibility of potential expert testimony in its *Daubert* gatekeeper role. FTC seeks the exclusion of "virtually all" of James G. Herblin's anticipated testimony, and BancTec seeks the exclusion of Shán O'Keeffe's[1] and Thomas Sexton's potential testimony. *See* DE ##73 (Herblin Motion); 75 (O'Keeffe Motion); 76 (Sexton Motion). The matters are fully briefed and ripe for consideration.[2] DE ##79, 81, 82, 88. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN**

---

[1] BancTec repeatedly misspells Mr. O'Keeffe's surname. For simplicity and accuracy, the Court uses the correct spelling throughout this Opinion, even in quotations.

[2] A court typically can resolve a *Daubert* motion without holding a hearing. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248-49 (6th Cir. 2001). A hearing is required only if the record is inadequate to decide the motion. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000). In this case, the parties *thoroughly* briefed the testimony's admissibility and developed an otherwise *extensive* record. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008) (affirming decision not to hold a *Daubert* hearing when "the record on the expert testimony was extensive, and the *Daubert* issue was fully briefed by the parties"). The Court concludes, in the circumstances, that a hearing is unnecessary to resolve the motions and so denies BancTec's requests for one.

1

**PART** DE #73, wholly **DENIES** DE #75, and **GRANTS IN PART** and **DENIES IN PART** DE #76.

*Standard*

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This Rule erects a "gate an expert witness must pass through on his way to court—one both inviting and imposing at the same time." *Lackey v. Robert Bosch Tool Corp.*, No. 16-29-ART, 2017 WL 129891, at *1 (E.D. Ky. Jan. 12, 2017) (referencing "the three keys the gate requires: proving that the witness is qualified, his testimony relevant, and his opinions reliably formed").

Facing challenges to several purported experts, the Court acts as gatekeeper to evaluate the admissibility of each potential witness's testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 113 S. Ct. 2786, 2798-99 (1993) ("assign[ing] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"); *see also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1175 (1999) (applying the *Daubert* inquiry to non-scientific testimony); *United States v. LaVictor*, 848 F.3d 428, 440-44 (6th Cir. 2017); *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 526-28

(6th Cir. 2014); *In re Scrap Metal*, 527 F.3d at 528-32; *United States v. Jones*, 107 F.3d 1147, 1150-61 (6th Cir. 1997). The Sixth Circuit recently explained:

> *Daubert* attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other. For expert testimony to be admissible, the court must find the expert to be: (1) qualified; (2) her testimony to be relevant; and (3) her testimony to be reliable. There is no 'definitive checklist or test' for striking this balance, but the Supreme Court in *Daubert* did identify four factors that normally bear on the inquiry: [(1)] whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*LaVictor*, 848 F.3d at 441 (citations and internal formatting removed); *see also In re Scrap Metal*, 527 F.3d at 529. As then-District Judge Thapar described:

> The Supreme Court in *Daubert* provided a list of factors for trial courts to consider as they evaluate the reliability of scientific testimony. *Daubert*, 509 U.S. at 593-94; *see also In re Scrap Metal*, 527 F.3d at 529. But that list is not exhaustive, nor any one factor dispositive. *See In re Scrap Metal*, 527 F.3d at 529. Rather, district courts have 'considerable leeway' in determining whether expert testimony is admissible. *See Meridia Prods. Liab. Litig. v. Abbot Labs*, 447 F.3d 861, 868 (6th Cir. 2006) (quoting *Kumho Tire*, 526 U.S. at 152). But the burden remains on the proponent of the testimony to establish its admissibility by a preponderance of the evidence. *Pride v. Bic Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

*Lackey*, 2017 WL 129891, at *2. Thus, under "*Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride*, 218 F.3d at 578.

In the Sixth Circuit, "rejection of expert testimony is the exception, rather than the rule[.]" *In re Scrap Metal*, 527 F.3d at 530. "The relevancy bar is low, demanding only

3

that the evidence logically advances a material aspect of the proposing party's case." *LaVictor*, 848 F.3d at 442 (internal quotation marks removed). The Circuit directs that "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Id.* "When there is a factual issue in dispute that expert testimony can clarify, there are limited grounds for rejecting the testimony of the expert witness." *Id.*; *see also Lee*, 760 F.3d at 528 (holding that a "mismatch between [two expert] theories of whether the cylinder was fully closed should not have precluded the admissibility of [one particular] expert opinion").

The Court of Appeals "recognize[s] that a district court operates with wide latitude in deciding how to test an expert's reliability, and, as such, must be afforded considerable leeway in deciding how to go about determining whether particular expert testimony is reliable." *LaVictor*, 848 F.3d at 443 (internal quotation marks and alteration removed). While these principles do not "require[] a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert, a court must be sure not to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *In re Scrap Metal*, 527 F.3d at 529 (cautioning courts not to "confuse[] the credibility and accuracy of [an] opinion with its reliability" (internal italics removed)) (internal quotation marks and citation removed). "Instead, the requirement that an expert's testimony be reliable means that it must be supported by appropriate validation—i.e., good grounds, based on what is known." *Id.* (internal quotation marks removed). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine

whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30.

*Analysis*

The Court has carefully assessed the motions under the applicable standards, taking into account the materials tendered (including the full depositions, the reports, and all exhibits). The Court largely denies all motions to exclude, though on the particulars that follow.

The summary judgment resolution defines much of the result and eliminates several of the arguments. There are many areas for resolution by a fact-finder, and most of the opinions suggested pass the *Daubert* threshold in the context of this case. That said, as to any and all experts, the Court will preclude any effort to opine on the law. Although any of the witnesses may refer to contract language or terms as context for an opinion about the facts or the commercial relationship and history at issue, the Court will not allow any witness to interpret or state opinions about the legal effects of language or the legal meaning of any contract or other term. The Court alone will state the law. The parties should plan witness examination accordingly.

**Herblin:**

FTC asks the Court to exclude "virtually all" of Mr. Herblin's proposed expert testimony. DE #73. The precise scope of the motion is difficult to ascertain relative to Herblin's multi-part report. BancTec responded. DE #79. FTC replied. DE #88.

The Court concludes that BancTec has justified the use of Herblin, as proposed, in all but a few of his opinion areas. He plainly has adequate qualifications in the areas addressed, and the Court finds his reliance on GAAP and other industry standards

persuasive in terms of the bases and objective standards of the points he makes. Thus, and addressing each section distinctly:

  A. Accounting observations

The proposed accounting and characterization testimony would be helpful to the trier of fact. Although the characterization (true lease v. operating lease) is not per se at issue, the accounting insight does shed light on the true economics of the transaction and helps explain the "why" of the deal, from BancTec's perspective. That perspective corroborates BancTec's intent as to the buyout and anticipated value at lease expiration. The financing model clarifies the parties' intent and expectations, and the methods used by Herblin, founded in recognized accounting principles, pass the relevancy and reliability bar.

  B. Lease term opinions

Herblin assesses the transactional record and makes experience and accounting based observations about the interim rent dispute. The primary bases are the parties' own statements and conduct. The Court finds the assessments helpful and the testimony appropriate under *Daubert*.

  C. Interest rate derivations

The interest rate calculation helpfully corroborates BancTec's lease-term posture. Herblin builds the opinion on reliable math principles and accounting inferences, all staked on FTC's own historical internal calculations and representations. Herblin's analysis and deduced points are appropriate evidence.

D.   AFLAC element

Although the AFLAC value issue may or may not be of significance at trial, the limited Herblin opinion is proper evidence. This is not an equipment valuation, but rather notes on the valuation of a particular soft cost under Schedule 8. The Court sees the opinion as assistive to the fact-finder.

E.   Buyout value & F. Alternative buyout value

The Court excludes the opinions proffered in sections E and F.

As to E, the core of the opinion is *legal* contract analysis, not a legitimate area for witness expertise. His view of what "trumps" what, in contract sequencing, is improper as a testimonial matter. Although Herblin references the buy-out exchanges, he parrots but brings no expertise to these exchanges, which the jury can assess for themselves. His overpayment views, on the prior buyout, rest on the improper opinion bases cited, and thus, the Court excludes them.

As to F, the Court excludes for three reasons. First, the communications involving FTC's counsel obviously are settlement offers—they explicitly reference settlement. That subject matter will not be part of the trial record, per FRE 408(a). BancTec is attempting to use a settlement offer to prove value; the Rule bars it. Second, Herblin loosely rests this Schedule 8 insight on alleged Schedule 7 comparison, but based only on hearsay and non-particular "discussions" with BancTec. This is speculative, inadequate, and, in the Court's view, unreliable as stated. Finally, the "contingency" analysis offers no logical link to the persisting case issues. Unlike the earlier accounting insights, the Court does not view the F opinion as contributing to the fact-finder's multiple tasks. As such, the Court excludes all of F.

7

G1. Notice & G2. Percent of contract revenues[3]

BancTec withdrew G1, DE #79, at 15, so the Court excludes it. As to G2, frankly, the Court does not perceive how the opinion fits into the remaining trial issues. BancTec has the burden here and fails to explain persuasively how the "contribution" analysis adds anything. As such, the Court excludes.

**O'Keeffe:**[4]

BancTec begins by merely expressing general "concerns about the admissibility of Mr. O'Keeffe's testimony and objects in order to require FTC to carry its burden to prove admissibility." DE #75-1, at 3. BancTec specifically faults O'Keeffe in three ways: it says he "overvalues the [S]chedule 8 equipment," provides irrelevant testimony about FMV "because [S]chedule 8 was a capital lease with a $0 buyout," and uses "suspect" methodology. *Id.* at 4. FTC responded. DE #81. BancTec had the opportunity to, but did not, reply.

*First*—the two primary bases fail because of the matters remaining for trial. The value issues are in dispute, and O'Keeffe has valid testimony directly helpful to resolving FMV. As such, whether he overvalued Schedule 8 is what BancTec can cross-examine and the jury can assess. Further, the $0 buyout argument, again, is something the jury will confront; O'Keeffe's testimony surely will be helpful if the jury must find FMV at any of the relevant claim points.

---

[3] Confusingly, Herblin included two Section Gs in his report. *See* DE #73-2, at 18-19 (listing "G. Notice Requirements under Paragraph 4(A) of the MLA" (which the Court calls G1) and "G. Percent of Contract Revenues" (which the Court calls G2)).

[4] BancTec makes largely conclusory and duplicative attacks on the opinion testimony of O'Keeffe and Sexton. As with Herblin, the issue is not one of qualifications. BancTec does not challenge that aspect, and the Court finds each qualified, based on the FTC showing and the record, in the opinion areas suggested.

BancTec's only other specific dispute with O'Keeffe's proposed testimony concerns his treatment of the "Aflac Deferred Contract Costs." O'Keeffe testified to his understanding, via information received from Mr. Bates, that these Costs were "software," or "propriety software," DE #75-5, at 29 (Depo. p. 115), and BancTec disputes that, DE #75-1, at 4 (citing, *e.g.*, the Bridges deposition). This is precisely the sort of fact dispute that *Daubert* and the Sixth Circuit instruct does not preclude an expert from testifying. The Court, as gatekeeper, does not determine "the correctness or truthfulness" of O'Keeffe's opinion, *In re Scrap Metal*, 527 F.3d at 529—that job will be for the jury, upon full examination at trial. *See Daubert*, 113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

*Second*—citing no authority, and in one succinct paragraph, BancTec claims O'Keeffe's "desktop" appraisal "without knowledge of the character of the assets is suspect under the *Daubert* factors." DE #75-1, at 5. The Court has considered all *Daubert* factors, to the extent logically applicable here, and concludes that O'Keeffe's testimony "rests upon a reliable foundation"—*i.e.*, that it is not "unsupported speculation." *In re Scrap Metal*, 527 F.3d at 529-30. O'Keeffe himself tells the Court that conducting a historical "desktop" appraisal (one without a physical inspection and to determine FMV as of a certain historical date (here, 10/16/15)), *see* DE #75-3, at 10 (O'Keeffe stating he "has not personally inspected the subject equipment"), is "normal practice" in the industry. DE #75-3, at 2. Indeed, O'Keeffe says that such "a physical inspection at a later date than the effective date of [his] appraisal would serve little purpose and, in fact, could

confuse and/or influence [him] when the current condition is not the condition that the equipment was in or should have been in as of the effective date of the appraisal." *Id.* at 7; *see also id.* at 9. The Court finds no basis to exclude O'Keeffe because he conducted a historical desktop appraisal.

Further, while BancTec may dispute certain "assumptions" behind O'Keeffe's FMV calculation—*e.g.*, that "a market exists" and certain transferability—those matters, again in these circumstances, go to the opinion's correctness, not its reliability.[5] *See also* DE ##75-3, at 12, ¶ 17 (O'Keeffe explaining his efforts to use "due diligence in all market comparisons"); 75-5, at 17 (Depo. p. 65) (BancTec's counsel acknowledging that software, as a general matter, "can be sold and transferred"); *id.* at 26 (Depo. pp. 101-02) (discussing the potential factual disputes surrounding possible software transferability). Additionally, the most basic assumption behind any FMV opinion is the existence of a willing buyer and willing seller—in other words, that a market exists.[6] BancTec will be free to cross-examine O'Keeffe before the jury to attempt to expose potential testimonial weaknesses.

---

[5] This is not a case where O'Keeffe's assumptions had no support in the record. *See, e.g.*, *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000); *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 538, 535 (6th Cir. 2010) ("[A]ssumptions must be supported by evidence in the record."); *see also, e.g.*, *Elcock v. Kmart Corp.*, 233 F.3d 734, n.12 (3d Cir. 2000) (approving excluding an expert's opinion "predicated on an assumption not supported by the record" or an assumption "without basis in the real world"); *In re TMI Litig.*, 193 F.3d 613, 674, 677 (3d Cir. 1999) (affirming exclusion when an expert based an opinion on an assumption "supported by nothing other than conjecture" and reaffirming that, generally, *Daubert* "does not preclude testimony merely because it may be based upon an assumption").

[6] BancTec concludes ¶ 11 with a bizarre, offhand complaint that O'Keeffe came to "differing estimated values of the equipment"—one for FMV and one for FMV in Continued Use. DE #75-1, at 5. O'Keeffe did indeed so differentiate, arguably reflecting a nuanced approach to the valuation question. *See* DE #75-3, at 16-17 (explaining the differences between FMV and FMV in Continued Use). BancTec identifies no *Daubert* concern here to preclude O'Keeffe from testifying.

Per this analysis, the Court denies DE #75 and opens the *Daubert* gate to Mr. O'Keeffe as an expert witness.

**Sexton:**

As with O'Keeffe, BancTec merely "has concerns about the admissibility of Mr. Sexton's testimony and objects in order to require FTC to carry its burden to prove admissibility." DE #76-1, at 3. BancTec specifically complains ("believes") that Sexton would offer "opinions outside the province of expert testimony," would provide irrelevant testimony, and uses "suspect" methodology. *Id.* at 3-4. FTC responded. DE #82. BancTec had the opportunity to, but did not, reply.

*First*—FTC candidly and helpfully "agrees that no expert can offer legal opinions[.]" DE #82, at 5. Indeed, expert testimony on the law is improper. *Zipkin*, 729 F.2d at 387; *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426-27 (6th Cir. 2006); *Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994). The Court will not allow any witness to make legal conclusions.[7]

*Second*—given the Court's summary judgment disposition, and as the Court treated O'Keeffe's potential testimony, the Court rejects this theory out of hand. Sexton's testimony is relevant to the trial issues.

*Third*—BancTec claims, in one terse paragraph, that Sexton's testimony "is suspect under the *Daubert* factors." DE #76-1, at 5. The only specific objection BancTec

---

[7] Many of Sexton's opinions, *see* DE #76-2, dance around, or even cross, this line. The Court will allow him to quote or cite lease language, but the Court will not allow him to draw broad, indeed any, conclusions about what duties or obligations the lease imposes. Paragraphs 5 and 9 are problematic, in some ways, in this area. The Court does not perceive those as truly central to Sexton's role, which really involves paragraph 10 and validating the desktop appraisal method. The Court will be watchful to preclude Sexton from veering into stating the law or drawing legal conclusions.

levies is that Sexton's testimony "relies on his *ipse dixit* that the definition of MLA paragraph 4(B) is 'substantially similar' to the definition of fair market value to which he is accustomed." *Id.* The Court agrees that, borrowing FTC's colorful phrasing, this argument is "sheer nonsense." DE #82, at 6. The two definitions are indeed essentially identical. *Compare* DE #26-1, at ¶ 4(B) (defining FMV as "the value which would be obtained in an arm's length transaction between an informed and willing buyer-user and an informed and willing seller under no compulsion to sell or buy")*, with* DE #76-2, at ¶ 1 (defining FMV as an amount "that may be reasonably expected for property in an exchange between a willing buyer and a willing seller, with equity to both, neither under any compulsion to buy or sell, and both fully aware of all relevant facts, as of a certain date"). To the extent BancTec wishes to endeavor to probe any extant air between the two definitions, it is free to do so via cross-examination before the jury. There is no merit to BancTec's peculiar exclusion argument on this topic.

Regardless, Sexton does not even opine on the FMV of any equipment. Rather, his opinion, reflecting what he says is the "standard practice in the leasing industry," is that "any appraisal of the Equipment may be done on a desktop basis without an inspection[.]" DE #76-2, at ¶ 10. BancTec offers no reason to exclude this conclusion, and the testimony is proper under *Daubert*.

Per this analysis, the Court grants in part and denies in part DE #76 and substantially (to the extent here stated, and except for pure legal conclusions) opens the *Daubert* gate to Mr. Sexton as an expert witness.

*Conclusion*

For the reasons, to the extent, and on the terms stated, the Court **GRANTS IN PART** and **DENIES IN PART** DE #73, wholly **DENIES** DE #75, and **GRANTS IN PART** and **DENIES IN PART** DE #76.

This the 26th day of September, 2017.

Signed By:
Robert E. Wier
United States Magistrate Judge