UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| FIRST TECHNOLOGY CAPITAL, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 5:16-CV-138-REW |
| v. | ) ) ) | OPINION AND ORDER |
| BANCTEC, INC., | ) ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The Court addresses another motion for reconsideration in this case.[1] This time, FTC seeks reconsideration of a targeted portion of the summary judgment opinion (DE #110). *See* DE #112 (Motion). BancTec responded. DE #114. FTC replied. DE #119. The matter is ripe for consideration.

*Standard of Review*

The Court has already, in this case, set out the standard:

"The Federal Rules of Civil Procedure do not explicitly address motions for reconsideration of interlocutory orders." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 88 F. App'x 949, 959 (6th Cir. 2004). However, "[d]istrict courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment." *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991); *see also, e.g.*, *In re Life Investors Ins. Co. of Am.*, 589 F.3d 319, 326 n.6 (6th Cir. 2009) ("[A] district court may always reconsider and revise its interlocutory orders while it retains jurisdiction over the case."). "This authority allows district courts to afford such relief from interlocutory orders as justice requires. Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez*, 88 F. App'x at 959 (internal quotation

---

[1] This will be the last act of reconsideration, relative to DE #110, before trial.

1

> marks and alteration removed); *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (same). "This standard obviously vests significant discretion in district courts." *Rodriguez*, 88 F. App'x at 959 n.7; *see also, e.g.*, *Kerns v. Caterpillar Inc.*, 144 F. Supp. 3d 963, 967 (M.D. Tenn. 2015) (applying the standard); *Simmerman v. Ace Bayou Corp.*, 304 F.R.D. 516, 518 (E.D. Ky. 2015) (same).

*First Tech. Capital, Inc. v. BancTec, Inc.*, No. 5:16-CV-138-REW, 2017 WL 2735516, at *1 (E.D. Ky. June 26, 2017). FTC here makes no argument of an intervening change in law or newly available evidence, so the Court proceeds under *Rodriguez* category 3, probing whether it made a "clear error" or there is a need to "prevent manifest injustice."

*Analysis*

FTC specifically "seeks reconsideration of that part of [DE #110] denying summary judgment on FTC's conversion claim." DE #112, at 1. FTC wants the Court to "hold that BancTec was in undisputed default in the sense used in ¶ 5(B) on account of its undisputed destruction of equipment and its failure to pay holdover rent" and to conclude from such a holding that "summary judgment on conversion liability" is proper. *Id.* at 5. FTC ultimately, though, leaves such a conclusion "for the Court to decide," given the logic and progression of DE #110. *See id.*

FTC's argument, as the Court understands DE #112, goes as follows: because (1) the Court held that BancTec *did* default under the MLA via the admitted hard drive alteration, DE #110, at 28-29, and, according to FTC, (2) *any* MLA default blocks application of ¶ 5(B), then (3) the Court erred in assessing conversion and ¶ 5(B) operation via only potential *payment* default, DE #110, at 21-26 & 21 n.11. The Court, for the reasons that follow, agrees with FTC, concludes it erred in the summary judgment

analysis on this issue, reconsiders DE #110, and grants FTC summary judgment on conversion liability based on the established hard-drive-alteration default.

As an initial matter, the Court agrees with FTC on the threshold waiver question: FTC did not waive argument that the hard-drive-alteration default blocks application of ¶ 5(B). BancTec does not contest this. *See* DE #114 (not contesting). A litigant waives an argument when it "fails to . . . develop the argument with specificity." *Nancy v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 558 (6th Cir. 2008). This question centers on the issues signified by footnote 11 of DE #110, where the Court stated that "FTC has not contended that any other default, except non-payment of rent (DE #91, at 10), would block this application of ¶ 5(B)." The page that the Court cited for this proposition indeed only makes reasoned argument as to payment-related default, but, as FTC argues, FTC did arguably incorporate broader contentions—that certain unnamed "other things," "argued above," also constituted Schedule 8 breaches that would block application of ¶ 5(B). *See* DE #91, at 10. One of the "other things" that FTC "argued above" was the destruction breach. *See id.* at 7. The Court joins FTC in "wish[ing] it had made its reliance on that default clearer," DE #112, at 8, but the Court agrees that FTC adequately preserved the argument, in context. FTC specifically made a lengthy breach argument as to the collateral damage, and that argument conceptually applies to ¶ 5(B) just as would a rent default. The Court erred when it failed to recognize this and process the argument in the summary judgment opinion. The Court will not procedurally foreclose this argument to penalize FTC for choosing to make one default-related argument "in somewhat more detail." *Id.*

Moving to the merits, the Court previously stated its reasoning for denying summary judgment on conversion:

> If BancTec did not default *on rental payments*, the jury will meter purchase liability under ¶ 5(B) at FMV, and BancTec will owe that amount, *yielding title to it and negating conversion*. If BancTec did default, then the Court anticipates the jury evaluating FMV as a conversion remedy[.]

DE #110, at 25 (emphases added). That analysis mistakenly only contemplated *payment* default, as the Court now clarifies. Pages later, the Court wrote, specifically regarding the hard-drive-alteration default:

> The Court reserves the issue of damages pending trial, given the need to resolve the purchase status. Thus, if the jury determines that the agreement obligated BancTec to purchase for fair market value, then FTC would not get an additional remedy for the alterations. Further, . . . the Court would treat FMV [as conversion recovery] as defined to fairly reflect value if BancTec had fulfilled its duty to preserve the equipment.

*Id.* at 29. The Court designed these two holdings, in the case posture as the Court then understood, to comprehensively address the possibilities as this case proceeds to a jury resolution. But this understanding, as the Court now recognizes, was incomplete.

Thus, there are two potential breaches at issue—one of which the summary judgment record established (the hard drive alteration), and one of which it did not (the non-payment of a potential 61st month of rent). The Court set up a dichotomy: If the jury finds no rent payment default, the jury would determine FMV as the measure of ¶ 5(B) damages. Upon BancTec's payment of that amount (in the Court's original assessment, regardless of the posture as to the alteration default), BancTec would own the equipment, negating conversion as a claim. If the jury finds a rent payment default, the Court, again, anticipated the jury determining FMV "as defined to fairly reflect value if BancTec had

4

fulfilled its duty to preserve the equipment" as measuring the proper amount of conversion damages.

This dichotomy, though, failed to recognize a third possibility—the one concerning which FTC now seeks reconsideration. *Even if* the jury finds no rent payment default (*i.e.*, that there was no 61st month of rent obligation), FTC argues, FTC is still entitled to conversion summary judgment and corresponding damages (to be determined by a jury) based on the prior hard-drive-alteration default. That default alone forestalls ¶ 5(B) from operating. The Court agrees with FTC and concludes that it erred in failing to so hold in DE #110. FTC is entitled to summary judgment on hard-drive-alteration-based conversion liability independent of consideration of a possible payment breach.

The Court previously saw "no contractual basis for a month-to-month rental when the lease expires and the lessee has defaulted." DE #110, at 21. The Court has already found an MLA default in BancTec's hard drive alteration. *See id.* at 28-29. Thus, applying the plain language of ¶ 5(B), the parties found themselves "at the expiration of the Initial Term," without BancTec having "elected to renew the Lease, purchase or return [sic] the Equipment." What is the meaning of the next clause, then?

The phrase "as long as" in MLA ¶ 5(B) quite obviously, to the Court, *does* mean "if," or "provided," at least in this particular context. To be sure, as FTC argues, "as long as" *could* mean "for as long as," *i.e.*, classic durational language indicating an obligation that endures for as long as a condition precedent is present. Consider, for example, a provision that read, "I agree to pay you commissions as long as I make the part." That would be read, quite reasonably, to indicate an enduring obligation on behalf of the promisor. *See DeMarco v. Ohio Decorative Prods., Inc.*, 19 F.3d 1432, No. 92-2294,

5

1994 WL 59009, at *11 (6th Cir. Feb. 25, 1994) (table) (so holding, discussing variant definitions of "as long as," rejecting engaging in "a battle of the dictionaries," and choosing that interpretation, which did "not defy reason").[2]

However, in more analogous syntactic and contextual circumstances, Kentucky's highest court (remember that the Court, on these matters, applies Kentucky law) made perfectly clear that the words "as long as she remains my widow" "are **equivalent to saying** '**provided** she remains my widow,' **and merely attached a condition** which made the estate defeasible upon her remarriage." *Hopson's Tr. v. Hopson*, 138 S.W.2d 365, 368 (Ky. 1940) (emphases added); *see also, e.g.*, *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (using "as long as" to mean "if" or "provided": "A warrant must be upheld as long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing." (internal quotation marks and alterations removed)); *Maynard v. Groome*, No. 2009-CA-835-MR, 2010 WL 2132803, at *2 (Ky. Ct. App. May 28, 2010) (same: "Groome was entitled to assess fees as long as those fees

---

[2] In a different factual scenario, the Court certainly accepts that ¶ 5(B)'s "as long as" could represent a similarly enduring obligation. The Court does not doubt that, for example, in a hypothetical where BancTec first defaulted *during* a valid ¶ 5(B) post-Initial-Term month-to-month rental period, FTC would not "be trapped in a month-to-month lease" despite the default. *See* DE #112, at 12. That is not the scenario in this case, though, and the Court evaluates ¶ 5(B)'s meaning in the current context. *See DeMarco*, 1994 WL 59009, at *11 (expressing that "as long as" has variant meanings, including differing definitions within the same dictionary, and choosing the sensible one based on "the context in which [the assurance] was given").

The Court views FTC's alternative argument that it is entitled to conversion liability summary judgment based on BancTec's "failure to pay holdover rent . . . during the duration of any month-to-month lease created by operation of ¶ 5(B)" as falling into this theoretical category. The Court rejects this argument because, under the applicable scenarios, it was impossible for a valid ¶ 5(B) post-Initial-Term month-to-month rental period to have begun in this case. Regardless of the 61st month rental issue (again, a disputed factual question for the jury to decide), as the Court holds in this Opinion, BancTec was in undisputed "default" via the hard drive alteration at the point of lease termination, blocking ¶ 5(B) application in any circumstance.

were reasonable."); *Cummins v. BIC USA, Inc.*, No. 1:08-CV-19, 2011 WL 3759415, at *2 (W.D. Ky. Aug. 25, 2011) (same: "As long as there is competent medical proof related to the claim of future medical expenses, Parker will be allowed to quantify those expenses.").

With that understanding, return to ¶ 5(B). The paragraph only provides for beginning a month-to-month lease extension if, "at the expiration of the Initial Term," BancTec "is not in default under the Lease." Here, quite plainly, at the expiration of the Initial Term, BancTec *was* in default under the MLA by virtue of its admitted, un-noticed, unauthorized, and uncured collateral alteration. BancTec's destruction of MLA-governed equipment is unquestionably a "default" ¶ 5(B) contemplates. Textually, ¶ 5(B) does not limit applicable "defaults" to "material defaults," as BancTec seems to suggest. [Elsewhere, the MLA explicitly contemplates "defaults in the performance of any other of [the] obligations under this Lease," MLA ¶ 17, clearly representing the parties' concern with defaults of *any MLA obligation*, not just "material" ones.] *Cf. Anderson v. Old Nat'l Bancorp*, No. 5:02-cv-324-R, 2008 WL 4500307, at *5 (W.D. Ky. Sept. 30, 2008) (citing *Blue Ridge Coal Co. v. Hurst*, 244 S.W. 892, 893 (Ky. 1922)) (explaining that "where [a] lease provides that a breach of one or more of the covenants shall work a forfeiture, the lessor may declare the forfeiture on an occurrence of the breach, even though the condition be a harsh one" and thus "hold[ing] that *any* breach triggers the termination clause in the Lease" and that "the Lease *does not require a material breach* to trigger the termination clause" (emphases added)). The Court declines to impose an unwritten materiality requirement on these sophisticated parties' carefully negotiated agreement. *Yates v. Mammoth Cave Nat'l Park Ass'n*, 55 S.W.2d 348, 348-49 (Ky. 1932)

7

("There is no better established rule of law in this state than that a court cannot make a contract for the parties, but can only construe the contract it finds they have entered into. **Nor has the court the authority to read words into a contract.**" (emphasis added)); *Wender Blue Gem Coal Co. v. Louisville Prop. Co.*, 125 S.W. 732, 735 (Ky. 1910) ("[T]he court cannot make for the parties a different contract than they have made for themselves.").[3]

Even if, though, the Court *did* imply a materiality requirement to a ¶ 5(B) "default," the Court would have no trouble concluding that destruction of the hard drives would qualify as a material default. *See, e.g.*, *ABCDW LLC v. Banning*, 388 P.3d 821, 833 (Ariz. Ct. App. 2016) ("Banning materially breached the contract by destroying the alfalfa before Landlords negotiated the second rate."). BancTec's basic non-destruction obligation appears *twice*—in two separate provisions—in the MLA, underscoring its centrality to the parties' agreement. *See* MLA, at ¶¶ 6 & 10. Indeed, as a matter of logic, to the Court, making payments properly due and not destroying leased equipment are the two most material obligations of any lease agreement. Kentucky law is clear that "the withholding of payments unconditionally owed is a material breach of a contract," *Morel Constr. Co., LLC v. Richardson Bulldozing, LLC*, No. 2013-CA-97-MR, 2014 WL 3548144, at *3 (Ky. Ct. App. July 18, 2014), and the Court concludes that destroying subject equipment is, too. The MLA gave BancTec an alteration route, but only with notice to FTC and only if the alteration did not disable the Equipment. MLA ¶ 16. Removing the operational brains from about 200/216 pieces of IT collateral surely is

---

[3] As FTC argues, the Court rejected (implicitly, at least) a similar materiality contention in DE #110 regarding the 61st month payment issue, holding that such a breach, if proven, would be a ¶ 5(B) "default" without also analyzing whether it would be a "material" default.

functionally significant, but BancTec did not reach out to notify or query FTC about it. Of course, BancTec did not repair the equipment or return it, post-expiration, "in good condition and working order." *Id.* ¶ 6. BancTec again tries to ignore the language of its own deal, favoring a holistic (read: text-ignoring) view, but the negotiated language controls.

Finally, BancTec, in only a half-page of writing, also invokes "a second maxim of contract law": that "if an injured party . . . treats [a] contract as continuing after a material breach, the injured party's obligations will not be discharged." DE #114, at 7 (citing, *e.g.*, *Papa John's Int'l, Inc. v. Specktacular Pizza, Inc.*, No. Civ. A. 305CV515H, 2005 WL 3132337, at *4 (W.D. Ky. Nov. 21, 2005) ("Under basic contract principles in Kentucky, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may respond to the other party's breach in one of two ways: (1) either stop performance and assume the contract is ended; or (2) continue performance and sue for damages.")).[4]

Among the obvious problems for BancTec, regarding this argument, is that FTC did not learn of the hard-drive-alteration default until after the litigation commenced, well after the end of the lease term. *See* DE #119, at 8. FTC could not have "treat[ed] the contract as continuing after a material breach" because FTC did not know, at the time BancTec destroyed the hard drives, and until well after lease termination, that there had been a material breach. *See, e.g.*, *Chaplin v. Bressire & Co.*, 361 S.W.2d 293, 297 (Ky.

---

[4] BancTec's precise argument in this section is unclear, to the Court. BancTec's argument heading is: "If there was a material breach, FTC waived it[.]" DE #114, at 7. The law BancTec cites, though, goes to the issue of (the lack of) discharge of FTC obligations, not potential breach waiver. The Court evaluates the contention as best it can, attempting to fairly account for BancTec's nebulous argument.

9

1962) (describing it as "possible," regarding application of a related doctrine, "for a party to waive his right of rescission by treating the contract as still in force **after he knows of the breach**" (emphasis added)); *Cox v. Pennington*, No. 2014-CA-1110-MR, 2015 WL 4385672, at *3 (Ky. Ct. App. July 17, 2015) (treating application of the same rescission waiver doctrine as dependent on the party actually being "aware of breaches of the" applicable contract).

Accordingly, as already described in the payment context, the Court concludes that the established hard-drive-alteration default also blocks application of ¶ 5(B) and, thus, results in a conversion analysis at the time of lease expiration. The Court previously reviewed the elements of conversion while considering the effect of a payment default. Default would conclude the issues and admit no jury issue on those topics, given "that BancTec would have neither renewed the lease, purchased the equipment, nor returned it to FTC." DE #110, at 25.[5] The Court still, even in those circumstances, reserved the

---

[5] Again, the Kentucky conversion elements are:

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005). Here, indisputably: (1) FTC had legal title to the leased property; (2) FTC had the right to possess it upon lease expiration; (3) BancTec exercised dominion over it in a manner that denied FTC's rights to use and enjoy the property and in a manner that was to BancTec's own use and beneficial enjoyment; (4) BancTec intended to interfere with FTC's possession via BancTec's refusal to return the property post-lease; (5) FTC

question of the proper "conversion remedy" (and only that question) for trial. *Id.* The Court simply applies that holding to its reconsideration ruling, granting FTC summary judgment on conversion liability but reserving the issue of the resulting remedy as a jury question, for all the reasons stated in DE #110.

*Conclusion*

For the reasons stated, the Court **GRANTS** DE #112 and, upon reconsideration of DE #110, **GRANTS** FTC summary judgment on conversion liability. The collateral alteration, in the manner it occurred, would thwart ¶ 5(B) from applying. Given MLA silence on post-termination status, the failure to return the collateral was conversion. The jury will decide the issue of resulting damages.

This the 1st day of February, 2018.

Signed By:
*Robert E. Wier* REW
United States Magistrate Judge

---

has made some demand for the property's return that BancTec denied, indeed the MLA required return; (6) BancTec's act was the legal cause of FTC's loss; and (7) FTC suffered damage. *See* DE #42-2, at ¶¶ 59, 70, 114, 119; *see also* DE #42-4, at 3 (BancTec: "It is undisputed that BancTec did not renew the Schedule 8 lease and did not return the Schedule 8 equipment."); *see also generally* DE #42-24. BancTec, over the course of many briefs on the topic, has never disputed existence of the conversion elements. The Court concludes, as it did before, and upon full examination of all case materials, that the summary judgment record establishes each element, leaving only a determination of the damage amount for the jury.